**CONSOLIDATED REALTY GROUP,**
**Plaintiff and Appellee,**

v.

**SIZZLING PLATTER, INC., dba Sizzler,**
**Defendant and Appellant.**

No. 950761–CA.

Court of Appeals of Utah.

Dec. 27, 1996.

Certiorari Denied April 2, 1997.

Thomas R. Karrenberg and Kate A. Toomey, Salt Lake City, for Appellant.

Michael L. Deamer, Salt Lake City, for Appellee.

Before GREENWOOD, HOWE[1] and JACKSON, JJ.

HOWE, Justice.

Sizzling Platter, Inc. ("SPI") appeals from a judgment entered in favor of Consolidated Realty Group ("Consolidated") and seeks judgment as a matter of law in its favor, or in the alternative a new trial on the issues of liability and damages.

## I. FACTS

This appeal stems from a suit filed by Consolidated, a licensed real estate broker, against SPI to recover a commission for a lease entered into by Hewlett Packard ("Hewlett") for space in a commercial building to be erected on property then owned by SPI and located at approximately 380 East 6400 South in Murray, Utah (the "Property").

In early 1992, Hewlett was renting space at a different location from Keith Romney. Consolidated contacted Hewlett and offered its services to help Hewlett relocate to a new building, but Hewlett declined in favor of maintaining its relationship with Romney. On March 26, 1992, Hewlett entered into a written lease with Compark VII Partnership ("Compark"), which was owned and controlled by Romney and a partner, Kent Buie, for space in a building to be constructed on the Property which Compark then owned. The lease (hereinafter the 1992 lease) did not contain an attornment agreement[2] and was subject to a prior mortgage

---

**1.** The Honorable Richard C. Howe, Utah Supreme Court Justice, sitting by special appointment pursuant to Utah Code Ann. § 78-7-9.5 (1995); Utah Code Jud. Admin. R3-108(3).

**2.** "Attornment is the act of a person who holds a leasehold interest, or estate for life or years, by which he agrees to become the tenant of a stranger who has acquired the fee in the land, or the remainder or reversion, or the right to the

on the Property held by First Security Bank. Consolidated had no role in these negotiations.

In May 1992, before the planned building was constructed, First Security Bank commenced a foreclosure on the Property. In lieu of foreclosure, Compark conveyed the Property by deed to First Security.[3] After First Security had acquired title, Consolidated arranged for a client, Lou Haynie, to enter into an Earnest Money Purchase Agreement with First Security for the Property. On June 18, 1992, this purchase agreement was assigned by Haynie to SPI which owns and operates restaurants in Utah, Idaho, Nevada, and Washington. One week later, SPI finalized the purchase of the Property from First Security Bank.

Following the purchase, Consolidated proposed to SPI that SPI build an office building on the Property and attempt to lease a portion of the space to Hewlett. The proposal was rejected by SPI because its primary interest was to build a restaurant on the Property. Despite SPI's rejection, Consolidated presented an "Exclusive Authorization to Lease Agreement" for the proposed office buildings to SPI, which it refused to sign. However, on August 3, 1992, Steve Lowe, executive vice-president, secretary, and general counsel for SPI, wrote and signed a letter to Consolidated (the "Letter Agreement") that contained the following:

> This letter will acknowledge the commitment of [SPI] to engage Consolidated Realty Group as its exclusive agent in leasing any development on the east portion of our recently acquired real property. . . .
>
> . . . .
>
> We are considering office building developments on the east portion [of the Property]. You have arranged an introductory

meeting with Keith Romney, who is the current landlord for Hewlett–Packard. We are planning to meet with Hewlett–Packard in Los Angeles later in this week. We may determine to build office space only for Sizzling Platter, Inc. My preference is a larger office building which would include space for prime tenants such as Hewlett–Packard.

> If the Hewlett–Packard development and lease is consummated, Sizzling Platter, Inc. will pay to Consolidated Realty Group a lease commission which will be determined in accordance with reasonable and standard market rates for similar projects in Salt Lake County. . . .
>
> Please accept this letter with assurances and my appreciation for all of your professional services.

As indicated by the Letter Agreement, Lowe and Romney flew to Los Angeles a few days later to meet with officers of Hewlett. At that time, SPI learned for the first time of the 1992 lease between Compark and Hewlett. Following the meeting, Romney and SPI took steps to substitute themselves into the 1992 lease which they considered to be still valid. First, the lease was assigned by Compark to Romney who in turn assigned it to RRW Partners ("RRW"). RRW was a partnership to be formed between Rockin' Robin, Inc., a company owned by the same principals as SPI, and Wonder Industries, Inc., a company owned and controlled by Romney.[4]

On March 3, 1993, Hewlett and Romney, acting on behalf of RRW, executed an addendum that altered several provisions of the 1992 lease and added some new terms.[5] Specifically, it substituted RRW as the landlord, added a clause that required delivery of the premises to Hewlett by December 31,

rent or services by which the tenant holds. It is an act by which a tenant acknowledges his obligation to a new landlord." *Black's Law Dictionary* 130 (6th ed.1990).

3. Although the property was deeded to First Security Bank in lieu of foreclosure, the parties treated the event as an actual foreclosure in proceedings before the trial court and in their briefs and arguments presented to this court. For purposes of this opinion, we do the same.

4. Actually, Wonder Industries did not even exist at the time RRW was assigned the lease. It was dissolved in 1990. In addition, Rockin Robin, Inc. was never properly funded by SPI.

5. Neither party has challenged the ability of RRW partners, an unformed partnership consisting of a dissolved corporation and an unfunded one (Rockin Robin, Inc.), or Romney individually, to enter into this lease. Therefore, we do not address the issue.

1993, gave Hewlett the right to erect two signs on the Property, and provided Hewlett with an option to expand into the balance of the first floor space after four years. In addition, it changed the address and square footage calculations to comply with the design of the building, the base rent to $18,848.76 per month, the method of calculating operating expenses, and the payment schedule. Each of these changes was made by reference to provisions in the 1992 lease.

The lease (including the new addendum) was then assigned by RRW to Rockin Robin, L.C. ("Rockin Robin"), a Utah limited liability company. The members of Rockin Robin are the same as the shareholders of SPI, although the ownership percentage that each shareholder owns in SPI is not the same as the percentage each owns as a member of Rockin Robin. SPI obtained construction and permanent financing to build the building and had the lease pledged as security for repayment of the loans. SPI thereafter conveyed the Property to Rockin Robin. In 1994, after completion of construction, Hewlett took possession of the space in the building with Rockin Robin as landlord and has continuously occupied it since. Hewlett pays a yearly rent of $226,185.12. The total rent to be paid under the seven-year term of the lease and addendum is approximately $1.6 million.

After Hewlett moved into the building, Consolidated requested its fee pursuant to the Letter Agreement, which SPI refused to pay. In response, Consolidated brought this suit against SPI. After discovery, SPI moved for summary judgment. Consolidated made a cross-motion for partial summary judgment on the issue of liability, reserving the issue of damages for trial. The trial court denied SPI's motion for complete summary judgment and granted partial summary judgment on the issue of liability in favor of Consolidated. Although the trial court's theory of liability is not completely clear, it explicitly found that an implied in fact contract was created by the parties' performance under the 1992 lease.

After a trial on the amount of damages, the court entered judgment in the amount of $82,242.90, plus post-judgment interest and costs in favor of Consolidated. The lease and addendum were used as a basis for the judgment, equal to six percent of the first five years' rent and three percent of the final two years' rent as specified in the lease. SPI appeals from the judgment and seeks judgment as a matter of law in its favor or in the alternative, a new trial.

## II. STANDARD OF REVIEW

"We accord conclusions of law no particular deference, but review them for correctness." *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985). In reviewing the grant of summary judgment by the trial court, "we accept the facts and inferences in the light most favorable to the losing party. Because summary judgment is granted as a matter of law, we may reconsider the trial court's legal conclusions." *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991) (citation omitted). *See also Mountain States Tel. & Tel. Co. v. Garfield County*, 811 P.2d 184, 192 (Utah 1991) ("In reviewing a grant of summary judgment, we view the facts in a light most favorable to the losing party.").

## III. ANALYSIS

### A. The Status of the Original Lease

The fundamental issues are whether the 1992 lease between Hewlett and Compark was terminated by First Security's foreclosure, and if so, whether a new lease was thereafter created. They are fundamental because the Letter Agreement required that a lease be consummated in the future and this requirement was not met if, as SPI argues, the 1992 lease was not terminated by the foreclosure but was assigned to Rockin Robin without creating a new lease. As to these issues, Consolidated maintains that the foreclosure by First Security terminated the 1992 lease and that a new lease came into existence through the execution of the addendum. As to whether the foreclosure terminated the 1992 lease, the trial court concluded that

in the absence of an attornment agreement, the lease between Hewlett and Compark VII ceased to exist when First Security obtained title to the property....

Since the parties' tenancy was for a term of years, Hewlett's rights under the lease could not have continued to exist unless Compark VII had terminated its estate through a voluntary transfer to a successor.

We agree. A mortgage that antedates a lease is a superior security interest to that lease. "If the sale of the landlord's interest is forced by one having a paramount title to that of the tenant, such as a mortgagee whose interest existed at the time the lease was made, the tenant's interest will be defeated by the sale." *Restatement (Second) of Property* § 15.1 (1981).

> Whether the lease addresses the matter or not, the estate for years cannot last longer than the estate from which it is carved. Thus a term of years ends whenever the landlord's estate ends.... [T]he subordinate tenant, while losing the right to possession in favor of the paramount titleholder, may nevertheless have a cause of action against his or her landlord for breach.

2 Richard R. Powell, *Powell on Real Property* § 16.03(7)(d) at 16–85 (1996). *See also Evershed v. Berry,* 20 Utah 2d 203, 205–6, 436 P.2d 438, 439–40 (1968) ("The rights and liabilities of the parties under a lease made after the mortgage are very different from those which exist when the mortgage is made after the lease.... A mortgagor cannot make a lease ... which will be binding upon the mortgagee.") (citations omitted); 4 *Thompson on Property* § 39.06(b)(1) (David A. Thomas ed. 1994) ("As with other forms of tenancy, the tenant's rights under the lease no longer exist if the landlord's estate comes to an end in any way other than a voluntary transfer to a successor.... [A] mortgage foreclosure in which the landlord's interest is involuntarily relinquished to satisfy a debt obligation which was secured by the landlord's property prior to creation of the lease results in termination of the tenant's interest in the property").[6]

Thus, although it appears that Hewlett could have brought an action against Compark for any damages it may have suffered because of First Security's foreclosure, the lease as a property interest was terminated. *See P.S.G. Ltd. v. August Income/Growth Fund,* 115 N.M. 579, 584, 855 P.2d 1043, 1048 (1993) ("A lease may be terminated in a foreclosure, and as a result, the lease provisions relating to the property rights are extinguished. However, independent contract provisions relating to the liabilities of the parties may survive.") Once the 1992 lease terminated, it could not thereafter be assigned by Compark to Romney and eventually to Rockin Robin. Thus SPI's contention that Rockin Robin and Hewlett are currently operating under the 1992 lease is rejected.

Since the 1992 lease was invalidated, the next question to be addressed is what constitutes the agreement, if any, under which Hewlett and Rockin Robin are currently operating. As a preliminary matter, we disagree with the trial court's ruling insofar as it concluded that the lease and the addendum were "void." In its conclusions of law, the trial court stated that "[s]ince the March 26, 1992, lease ceased to exist when First Security obtained title to the property, the addendum to the original lease Hewlett–Packard and RRW Partners signed on March 3, 1993 is also void." A void contract is "[o]ne which never had any legal existence or effect, and such contract cannot in any manner have life breathed into it," *Black's Law Dictionary* 1412 (5th ed.1979) (citing *Nat'l Union Indem. Co. v. Bruce Bros.,* 44

---

[6] Although the authorities are not unanimous, "[o]rdinarily, ... the foreclosure of a mortgage affects the rights and interests of only such persons as are made parties; and one in possession of real estate under claim of right from a mortgagor is a necessary party to a foreclosure of the mortgage, and a decree of foreclosure is not effective as to him unless he is joined." 55 Am.Jur.2d *Mortgages* § 574 (1995).

Apparently, the Utah courts have never addressed whether a lessee must be made a party to a mortgage foreclosure proceeding or whether the requirement, if adopted, would apply to a lessee yet to acquire possession of the property, and we do not address those issues today. Our holding is limited to the facts before us—when property is deeded to the mortgagee in lieu of foreclosure, a lease interest acquired subsequent to the mortgage that has not yet become possessory is terminated. We leave the questions of whether the lessee must be joined in an actual foreclosure proceeding and if so, under what circumstances, for another day.

Ariz. 454, 38 P.2d 648, 652 (1934)), and is thus different from a contract which has been invalidated, breached, or terminated.[7] Although it is unclear from the trial judge's conclusions of law whether she believed the original lease was rendered void or merely invalidated by the foreclosure (since both terms were used at times), the use of the term "void" created some confusion in the briefs submitted by the parties to this court.

SPI seizes upon the ambiguity in the trial court's findings by arguing before this court that there could be no commission if the lease was indeed void because a void lease cannot be the basis of a cause of action for payment, *see In re Tampa Chain Co.*, 35 B.R. 568, 578 (Bankr.S.D.N.Y.1983) (citing 1 Corbin, *Corbin on Contracts* § 7 (1969)), and that under those circumstances no lease was "consummated" as required by the Letter Agreement. But these arguments have no application to an agreement that has been terminated, rather than voided. Thus we disavow the trial court's determination that the lease was void and hold that the lease was merely invalidated by the foreclosure of First Security. In doing so, we also reject the arguments of SPI that are based on the trial court's conclusion that the lease was void.

■ Consequently, there is no reason to conclude that the addendum was invalid because it was appended to a void lease as the trial court held. Rather, we believe that the addendum was validly executed and incorporated the 1992 lease that the parties believed to be valid, thus creating a new lease agreement that included the terms of the 1992 lease as modified by the changes in the addendum.

"Parties may incorporate by reference into their contract the terms of some other document," 17A C.J.S. *Contracts* § 299 (1963). Under Utah case law:

> In order [f]or the terms of another document to be incorporated into the document executed by the parties, the reference must be clear and unequivocal, and must be called to the attention of the other party, [the party] must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties....

*Interwest Const. v. Palmer*, 886 P.2d 92, 97 n. 8 (Utah.Ct.App.1994) (quoting 17A C.J.S. *Contracts* § 299 (1963)).

Each of these requirements was satisfied in this case. Every change made by the parties referred to the 1992 lease and both parties were not only aware of the existence of the original lease, but *intended* to adopt its terms in the addendum. The penultimate paragraph of the addendum concluded: "The remaining terms of the lease dated March 26, 1992 shall be as stated in said lease." In addition, the 1992 lease was readily available for both parties to consult and the terms were well known to them. Thus we find that the execution of the addendum, which occurred *after* the Letter Agreement, created a new lease that included the terms of the 1992 lease through incorporation, as modified and supplemented by the addendum, thereby satisfying the Letter Agreement's requirement that a lease be created in the future.[8]

---

7. The term "void," however, as applicable to conveyances or other agreements, has not at all times been used with technical precision, nor restricted to its peculiar and limited sense, as contradistinguished from "voidable"; it being frequently introduced, even by legal writers and jurists, when the purpose is nothing further than to indicate that a contract was invalid, and not binding in law. But the distinction between the terms "void" and "voidable," in their application to contracts, is often one of great practical importance; and, whenever entire technical accuracy is required, the term "void" can only be properly applied to those contracts that are of no effect whatsoever, such as are a mere nullity, and incapable of confirmation or ratification.
*Black's Law Dictionary* 1411 (5th ed.1979).

8. Alternatively, a lease was created by the fact that the parties performed under an invalid lease that they believed to be valid.

> Where a party enters and occupies the land of another and pays rent under an invalid or unenforceable lease, a landlord-tenant relationship will be implied by law between the occupant and the owner of the land as a result of that occupancy and payment of rent.

49 Am.Jur.2d *Landlord and Tenant* § 112 (1995). Under this theory, it appears that the terms of the lease and the addendum would control as well, with the possible exception of the term of the lease. Authority states that if an "implied lease" theory were the only basis for a new lease, the term would be converted from a tenancy for years to a year to year tenancy. *See*

### B. The Terms of the Letter Agreement

■ SPI contends that even if the lease between Hewlett and Rockin Robin arose after the Letter Agreement was written, as both the trial court and we have concluded, under the terms of the Letter Agreement it cannot be held liable for a commission on a lease to which it is not a party. Resolving this issue requires interpreting the Letter Agreement, because if it required that SPI itself be a signatory to the lease with Hewlett, then SPI cannot be liable.

"Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness." *Sackler v. Savin,* 897 P.2d 1217, 1220 (Utah 1995) (quoting *Zions First Nat'l Bank, N.A. v. National Am. Title Ins. Co.,* 749 P.2d 651, 653 (Utah 1988)). *See also AOK Lands, Inc. v. Shand, Morahan & Co.,* 860 P.2d 924, 925 (Utah 1993) ("We accord the trial court's legal conclusions regarding the contract no deference but review them for correctness.").

SPI's primary contention regarding this issue is that Consolidated is not entitled to a commission unless its efforts culminate in the exact lease that was required of it under the alleged brokerage contract. As support for this assertion, SPI cites *E.B. Wicks Co. v. Moyle,* 103 Utah 554, 137 P.2d 342 (1943). In that case, the agent plaintiff claimed it had an agreement with defendant to procure a lease from a particular tenant to begin on April 1, 1940. The intended tenant and the landlord entered into a lease that began on May 1, 1940, instead, and the Utah Supreme Court denied a commission because the agent had not complied with the strict terms of a *special agreement.* The Supreme Court's holding was primarily based on the Restatement of Agency § 447:

> An agent whose compensation is conditional upon his procuring a transaction upon specified terms is not entitled to such compensation if, as a result of his efforts a transaction is effected on different or modified terms, although the principal may thereby benefit.

This provision remains substantially the same in the Restatement (Second) of Agency and a comment to that section is enlightening:

> *In the ordinary situation* in which the principal promises a broker a commission for finding a purchaser and the asking terms are stated to the broker, the usual interpretation is that the asking terms are intended merely to guide the broker in starting negotiations, and the broker is to have his commission if he produces a customer ready and willing to purchase on the asking terms or on such modified terms as the principal may subsequently accept before the agency is revoked.

*Restatement (Second) of Agency* § 447 cmt. b (1958) (emphasis added). Thus agreements are normally interpreted to require a broker to produce a willing buyer and any terms set forth in the agreement are considered to be an indication of those ultimately desired but are not conditions to receiving a commission unless the agreement specifically requires it.

This comports with Utah law which defines a real estate broker, in part, as one "who with the expectation of receiving valuable consideration, assists or directs in the procurement of prospects for" real estate, including leases. Utah Code Ann. § 61–2–2[12](d) (1996).

> The essential feature of a broker's employment is to bring the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement. They may reach that agreement without [the broker's] aid or interference.

*Diversified Gen. v. White Barn Golf Course,* 584 P.2d 848, 850 (Utah 1978).

49 Am.Jur.2d, *Landlord and Tenant* § 114 (1995) ("After entry under an invalid lease for a term of years reserving a yearly rent payable in installments, where one or more installments are received and accepted as such by the owner, the tenant becomes a tenant from year to year.").

However, we do not address the issue since we rely on the theory that the execution of the addendum created a new lease that included all the terms of the 1992 lease as modified by the addendum.

Consolidated fits this definition and fulfilled this role. The Letter Agreement acknowledged that Consolidated had arranged a meeting with Romney and submitted several proposals for the development of the property. Bringing Romney, Hewlett, and SPI together allowed those parties to work out their own agreement and entitled Consolidated to the lease commission it claimed.

The Letter Agreement did not set forth any express requirements. Rather, it merely stated that "If the Hewlett–Packard development and lease is consummated, [SPI] will pay to Consolidated ... a lease commission...." No specific terms were laid down and there was no requirement that SPI proper be a signatory to the lease. Rather, SPI entered into a *general agreement* that if the Hewlett lease was consummated, Consolidated would receive a commission and that is exactly what transpired. Based on our interpretation of the Letter Agreement, Consolidated performed services in compliance with its terms and in so doing rendered a compensable real estate service that entitled it to the commission awarded by the trial court.

## C. The Sufficiency of Consolidated's Complaint

█ SPI next contends that even if liability can be predicated on these bases, Consolidated's complaint was defective so as to bar recovery. This assertion is based on the fact that Consolidated's complaint alleged liability on the basis of "the consummation of a lease agreement *between Hewlett–Packard and Sizzling Platter, Inc.* for which Consolidated claims entitlement to a reasonable commission or fee" (emphasis added). It is undisputed that SPI itself was not a party to a lease with Hewlett.

Rule 8(a)(1) of the Utah Rules of Civil Procedure, which is substantially the same as its federal counterpart, requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." SPI charges that the trial court impermissibly "recast the complaint and granted relief on a theory that was not pled and not tried," *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1174 (1st Cir.1995), a practice condemned by the First Circuit in

that case. *Rodriguez* involved a sexual harassment suit brought under Title VII. The district judge dismissed the federal causes of action in light of Supreme Court rulings but introduced on its own accord claims under Puerto Rico law. The First Circuit reversed, and SPI urges that we follow the reasoning of *Rodriguez* and do the same in this case.

However, the reasoning of *Rodriguez* does not apply on the facts of this case because the defect in the complaint about which SPI complains is nothing more than a technicality. In a notice pleading jurisdiction like Utah, rule 8(a) "is to be liberally construed when determining the sufficiency of a plaintiff's complaint," *Gill v. Timm*, 720 P.2d 1352, 1353 (Utah 1986) and the text of rule 8 itself declares that "[a]ll pleadings shall be so construed as to do substantial justice." Utah R. Civ. P. 8(f). The days of strict adherence to draconian formalities at the pleading stage are over. Rather, "the fundamental purpose of the liberalized pleading rules is to afford parties 'the privilege of presenting whatever legitimate contentions they have pertaining to their dispute,' subject only to the requirement that their adversaries have 'fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved.'" *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 971 (Utah 1982) (citations omitted). *Accord Rodriguez, supra* at 1171 ("A fundamental purpose of the pleadings ... is to afford the opposing party fair notice of the claims asserted against him and the grounds on which those claims rest.").

In this case, SPI had notice of the claims at issue as well as the grounds upon which they were based. The fact that Rockin Robin was actually the landlord in the lease is immaterial. The principals in SPI and Rockin Robin were the same, and Lowe, a vice president and general counsel of SPI and shareholder of Rockin Robin, negotiated the assignment of the lease and was heavily involved in the project from the beginning. In addition, it is apparent from the defenses raised by SPI that it understood precisely what claims were being made and to which agreement they pertained. Under these cir-

cumstances, there can be no doubt that SPI had notice of Consolidated's claim and that SPI was not unfairly prejudiced. *See* Utah R. Civ. P. 15(b).

### D. Calculation of the Commission

As we stated above, the judgment of the trial court was based on the lease agreement, equal to six percent of the first five years' rent and three percent of the final two years' rent under the lease. SPI contends that the "trial court erred in ruling that a standard and reasonable lease commission can be determined on the basis of a void lease."[9] However, this contention is settled by our conclusion above that the 1992 lease was invalidated but not voided by the foreclosure of First Security, and a new lease was created by the execution of the addendum. Thus the trial court did nothing more than apply the formula provided by expert witnesses at trial to the newly created lease to derive the proper commission for Consolidated, and therefore acted properly.

### E. Fraud in the Inducement

Finally, SPI contends that the trial court's granting of summary judgment in favor of Consolidated was in error because a genuine issue of material fact existed as to whether Consolidated fraudulently induced SPI to enter into the Letter Agreement. The basis for this fraud claim is that Consolidated, as the agent of SPI, owed a fiduciary duty to SPI that was breached when Consolidated failed to inform SPI of the 1992 lease agreement between Compark and Hewlett. SPI asserts that it would not have entered into the Letter Agreement if it had known that a lease was already in effect between Compark and Hewlett.

Based on our conclusion that the 1992 lease was invalidated by the First Security foreclosure, we agree with the trial court that no material issue of fact existed as to whether Consolidated was required to disclose the existence of a terminated agreement in order to avoid committing fraud. Consolidated's

failure to do so could not rise to the level of fraud or even a breach of fiduciary duty. Thus the trial court properly granted Consolidated's motion for summary judgment on this issue as well.

Judgment affirmed.

GREENWOOD and JACKSON, JJ., concur.

---

9. SPI also argued that the trial court failed to take any expert testimony on the standard and reasonable commission for an implied lease. We do not address this issue because we rely only secondarily on the trial court's theory that an implied lease was created by Hewlett and Rockin Robin by performing under an invalid lease that the parties believed to be valid.